Okay, Mr. Shoemaker, you have reserved three minutes for rebuttal, so seven to begin. Thank you. Good morning. I'm Paul Shoemaker, the attorney for plaintiff at Atlanta, John Clutch Tassy. This is an appeal from a branch of Sunday government where the District Court usurped the functions of the jury. The District Judge took over the evaluation of the credibility of witnesses, the interpretation and making of inferences, and the determination of motivation. The District Court's transgressions were manifold and uniformly devastating to the plaintiff's case. Where was the credibility? What are you referring to when you say that the District Judge took over the credibility findings? Well, the District Court credited the testimony of the FAA's witnesses, even though all of those witnesses were involved in the matters at issue, such that their credibility should be determined by the jury. Well, credited them how? You mean by concluding that the defendants had met their burden at Step 2 of the McDonnell-Douglas test? By concluding that the investigation was bonafide, that they had considered alternative penalties, that they had... So, isn't that then something that you must show and show us evidence that there was a pretext when they decided to do this? So, what evidence do you have that there was a pretext? Well, we have to take a step back. If I may, Your Honor, there is direct evidence of retaliatory violence. Mr. Tassi's manager, Eric Anderson... Now, and that's my question. Is the evidence of retaliatory animus, that is the original statement by Anderson, which gets you to the second point where they then have to give a reason, and they give a reason, and you have to show pretext. Does that original evidence of animus suffice to show pretext, or do you need more? Well, Your Honor, analytically, I believe we're skipping over a step. We do not need to show pretext. We do not get to the McDonnell-Douglas test... I'm sorry. ...if we have direct evidence. If you have evidence of some animus because of which they may have retaliated, but they then come in and say, but this is the reason we fired the person, assuming fired, you know, we did what we did, and that is our evidence, then it is your job to say that that is pretextual. And you have possibly two things, the original statement, which got you by the prima facie case in the first instance, and then what else do you have? The fact that they gave slightly different reasons for the penalty? Now, is that enough to show pretext? Well, let me answer your question. Mr. Tassie's does have evidence sufficient to show pretext. The FAA created... What is that evidence? Yes. The FAA created and presented a paper trail. The district court accepted that at face value by relying on the testimony of the witnesses who supported it. That was error. A jury is not required to credit their testimony, and the paper trail must be evaluated in the context that it was generated at the behest of Anderson, the individual who was hostile towards Tassie and towards his EEO on the claim. A reasonable jury could find that the investigation was a sham. The questions that we raise about the legitimacy of the investigation include, number one, there was no meaningful consideration of lesser penalties short of termination of Tassie's employment. Do you have any comparators for lesser penalties? The only evidence, information they gave us was there was one statement by one of their witnesses that, well, one person was suspended for five days for making tape recordings. There was no evidence that anybody has ever been fired for this kind of thing. There was also no evidence of any consideration of the supposed concerns. I don't deny that there are concerns about tape recording enforcement, but the concerns that are raised by the FAA's policy are concerns about security and confidentiality. Tassie's tape recordings did not implicate these concerns at all, and they don't even discuss that in their report. There was also no comprehensive research on penalties imposed in other tape recording cases, and there is the timing issue that this investigation was rushed out. I mean, it took a while, but then all of a sudden— Can I ask a question? What would tape recording in and of itself be sufficient grounds for firing somebody at the FAA? The answer is it depends. Yes, they have a policy against it. They do have a policy against it. Potential penalties and termination is one of the potential penalties. Okay. Are you asking us to create—because it wasn't clear to me from your briefing. I think one reading of your briefing is that you were asking us to create new law that said that a protected activity will serve to rebut a charge of a defense against pretext for the adverse action. Is that something that you're asking us to create today? What we're saying about the protected activity is that there has to be a weighing of the significance of a protected activity for an employee versus the significance of enforcement of the policy for an employee. Okay, so you want a weighing. You don't want to say that protected activities always preclude someone or it's always a defense or a shield. Yes, we refer back to a decision made years ago by Judge Weinfeld, and there's a lot of work on the law since then, but this has to be balanced. Okay, what about lying, though? I mean, the protected activity of taping when it's trying to prove discrimination might be a hard case for some judges, but what about lying? When is lying in an investigation ever going to not be enough? Well, on that I would say look at exactly what they're talking about. He admitted that he made the tapes. Yeah, but your basic argument is that even though he did this, which could be grounds for firing, that was not why they fired him. And that there is evidence that they used this valid ground as a pretext for doing something else. That is your basic argument. And what I come back to is what evidence is there that they were not using the valid ground? The evidence is that there was another motivation. There was the retaliatory animus, and the basis on which they imposed this penalty, they held him in the back and then they bartered out. There may be cases where you might be able to penalize somebody, but why did they do it here? Is a mixed motive framework available in a retaliation claim under Title VII? I'm sorry? Is a mixed motive framework available under retaliation claims under Title VII? I'm afraid I have to say I don't know. I believe, however, what I'm arguing is that there is no need to get to McDonnell Douglas if you have direct evidence of retaliatory motive. We quote, admittedly, it's in a circumstantial way. Okay, right, but I think what I think both Judge Calabresi and I are trying to get at is there's motives of different things. There's motives of the investigation, there's motives of the taping, there's motives of the lying, and you're saying but there's also motives of animus. So the question is, is that can those other motives defeat your claim of animus? And whose burden is it to show us that? I believe the answer is that it's for a jury to determine was the retaliatory animus a motivating factor if you have direct evidence of retaliatory animus. But you use this same recording as evidence, as direct evidence of discriminatory animus, right? And the circuit affirmed the district court in saying that that wasn't, in fact, what it was. I mean, it's – I'm not – you keep stating very assertively that this is direct evidence of retaliatory animus. The second circuit – the court revealed that it refused to tape. And Judge – the district court judge simply said, I reject plaintiff's interpretation of the tape. But there's no finding that the plaintiff's interpretation is unreasonable. Mr. Anderson said to Mr. Cassidy that the other employees are shunning you because they're afraid you'll make an EEO complaint against them. That's an admission of retaliation. And Mr. Anderson refused to do anything about it, even if there was retaliation going on. He also told Mr. Cassidy that you have to stop complaining or your job is in jeopardy, you're in the wrong job. He also told Mr. Cassidy that when I was a black employee, he – the manager was black. And he said, when I was a young employee here, these same people came after me, but I didn't complain. And they're not treating you right, but you – Now, let me – let me just ask you. Let's have that there. And then let's assume there is evidence that your client stole $20 million from the company. Are you saying that nonetheless, because there is some evidence of retaliation, the fact that they then fire him for stealing $20 million doesn't matter because the evidence of animus is enough to get you out of McDonnell Douglas? Now, I must say I don't understand that. I thought that the whole thing was if you have that, you get into McDonnell Douglas, they come back and say, but that's not why we did it. It's true you have a prima facie case, but that's not why we did it. And then it's up to you to bring in evidence as to why that explanation about $20 million was a lie. And there you can do it either by having inconsistencies or by showing that other people who stole $20 million only got a tap on the nose. But you haven't shown that. Well, I respectfully disagree, though, that the arguments I'm making, they did not establish that any similar penalty had ever been presented. But I think the point is it's your burden to show that he was treated differently than other similarly situated people. You say throughout your brief that he was treated uncharacteristically harshly, that he was treated tougher than was appropriate. But you don't cite any evidence to show that that's, in fact, the case. The evidence is that the only thing in the record is that they imposed a five-day suspension on another employee who made tape recordings. And others, they didn't even impose penalties. That was the testimony of their witness. Okay. Thank you. All right. Well, we will reserve decision. Thank you both. No, no. Oh, I'm sorry. I'm jumping ahead. You're a little early. No, we'll hear from, well, unless you don't want to talk. But he has three minutes. Exactly. We gave you a lot more, though, didn't we? More than you bargained for. Ms. Zito, apologies. Good morning, Your Honor. May it please the Court. I'm Nicole Zito. I'm Assistant United States Attorney in the Eastern District of New York. Here today on behalf of Defendant Kelly, Peter Buttigieg. Plaintiff's argument today suffers from the same flaws as his brief. It's replete with sweeping generalizations, speculations, and thus unsupported assertions. What it critically lacks is any concrete, admissible evidence from which this Court, for a reasonable juror, could conclude that the FAA retaliated against Mr. Toschi. For this reason, this Court should affirm the holding of the District Court. Doesn't the fact that different people gave different reasons for the penalty at least potentially support a jury finding that the penalty that was imposed was pretextual? I'm not saying the penalty couldn't have been, but the argument which I haven't heard him make, but which might have been made, is that some people said we do this for this reason, some people said we do it for another reason, and is that enough to say it should be a jury to decide? I don't think anyone said that they did it for different reasons. The ultimate decision-maker in this case was Mr. Anderson. He consulted with HR and with another individual from the FAA, but all the individuals agreed that the NOPR was issued for three different violations of FAA policy, Mr. Toschi's unauthorized recordings, his misuse of government property, and his lack of candor in the investigation. And Mr. Toschi's counsel spoke earlier about a comparator, but that comparator is not similarly situated in any maternal respects to Mr. Toschi. That individual violated one policy, the recording policy. He did not violate the—he did not misuse government property. He did not lack candor. And when he violated the recording policy, he did so on one occasion and accidentally. That's demonstrably different than what Mr. Toschi did, which was knowingly, intentionally, and covertly recording for almost four years from when he immediately started at the FAA in Farmingdale before any alleged discrimination. Can I ask, does the government think that a policy, that an employer's policy, can prohibit protected activity, activity that would be otherwise protected? So I think as a general matter, employers can't prohibit employees from engaging in protected activity. But the issue here, and what the record reflects here, is that Mr. Toschi not only violated that policy, but did so in such a way that wasn't consistent with protected activity. So like the taping of the trainings and the other things that didn't have— that wouldn't have been probative as to his own discrimination. Correct. He taped trainings. He taped communications with field operators. Okay, so you're not asking us to conclude that something so sweeping, that an employer policy can ban otherwise protected activity. No, and I don't think that finding is necessary if you're doing a factual record. One other thing that I wanted to address is that Mr. Toschi's comment, he said that it was a sham investigation and that that was evidence of pretext. I think it's important to note here that once the FAA learned of a potential violation, they engaged a neutral special agent from the Office of Security and Hazardous Safety Materials, which is an independent division of the FAA. This individual was trained in conducting investigations and was not part of Anderson's management chain or Mr. Toschi's office. She conducted a multi-month long investigation, which included conversations with multiple individuals in the office and even included a silent statement from Mr. Toschi. Yeah, but the decision maker in the end was Anderson. So one could still say, yes, what the investigation found was that this person violated rules because of which he could be fired or treated, but that the reason that Anderson did it was a different one. That's not, I mean, it's useful to you, but it isn't determinative, is it? I mean, Mr. Anderson made the ultimate decision in consultation with other individuals at the FAA, and Mr. Toschi's counsel has not pointed, again, to any admissible evidence to suggest that there was a retaliatory motive that Mr. Anderson had and it wasn't actually these policy violations that Mr. Toschi acknowledged he committed. That was the reason for the proposal. Yeah. Again? Mr. Toschi's counsel also mentioned that he thinks it's pretext because the policies didn't actually implicate safety, and that's incorrect. The fact of the investigation was the policy violations in and of themselves. Mr. Toschi misused government property on 77 occasions, 77 times when he put the government's data security at issue. The fact that there was no actual breach is not relevant to whether he violated those policies. Well, would you respond, I guess, to Mr. Shoemaker's statement about the recording? He's saying that that's direct evidence of retaliatory animus, and I want to see if you disagree with that characterization or if you have a different characterization. Sure. I think that that's wrong for two reasons. First, as Your Honor pointed out, this court already evaluated those comments in the context of the first case and found that they were insufficient to support a dispute as to the discrimination claim, and specifically the comment that Mr. Toschi is pointing to where Mr. Anderson said, you know, maybe individuals aren't fearful of bringing you out from training because they're worried about getting a DDO claim. This court called that comment, quote, mere speculation. And I think it also fails, even putting aside that prior holding, for the fundamental reason that in order for something to be direct evidence of retaliation, there needs to be some specific link between the comment and the ultimate decision, and that's not the case here. This comment and this conversation are both disconnected in time and in substance from the ultimate decision. So it's important to remember that this conversation took place in October of 2018. That's 10 months before the FAA learned that Mr. Toschi engaged in any violations. That's over a year before the FAA Special Agent issued a report of investigation, and it's nearly a year and a half before the final decision was issued to give Mr. Toschi a notice of proposed removal. In addition, when you look at the comments as part of a larger conversation and not just selectively pick comments out, it's clear that this conversation, which is about an hour and 15 minutes long, is at its core a pep talk. It's Mr. Anderson trying to support and help and encourage Mr. Toschi to move forward and be successful in his employment at the FAA. It has nothing to do with his policy violation. It has nothing to do with the investigation. It has nothing to do with his decision-making. Even if you view the comment in isolation, you can get a comment. It's at most speculation as to why trainers, other individuals, might not want to go out on field visits with him, and that's not an issue in this case. It's not evidence that a year and a half later, Mr. Anderson retaliated against Mr. Toschi when he, in combination with other decision-makers, determined that the NOBR was the appropriate penalty for three different admitted violations of FAA policies implicating security. Anything else you wish to cover? Given the ample and undisputed evidence, I don't think any reasonable fact finder could find that Mr. Toschi was retaliated against, and so, for this reason, this court should confirm the judgment of Mr. Toschi. All right. Thank you, Ms. Eaton. All right, Mr. Shoemaker, you've got three minutes to rebuttal. I didn't mean to shortchange you. Well, thank you. In terms of the temporal proximity of arguments, yes, the conversation was before the termination. Our theory of the case is that Mr. Anderson was awaiting an opportunity to retaliate, and the temporal proximity is that an initial EEO claim was dismissed on one day. Mr. Anderson immediately had a notice of proposed removal prepared and gave it to Mr. Cassie three days later. Our theory of the case is that that is temporal proximity, evidence that Mr. Anderson was implementing his intentions to retaliate, which had existed during the initial conversation months earlier, and then he had his opportunity to act and get Cassie out of the organization. But temporal proximity is usually only in step one. I mean, we're really focused on step three here, right, which is where the burden shifts back to Mr. Cassie to show that the stated reasons were pretextual. I understand, but I think that the timing also was part of the evidence of pretext, that it was in connection with— Well, what you're saying is that timing may be part of—is a necessary condition, but when it is there, it can also have more weight and suggest more is what you're doing. Thank you, Your Honor. And in terms of the investigation, I would also emphasize that the FAA did not ask Mr. Cassie for the tapes. They never reviewed the tapes. They'd say, oh, you made a lot of tapes. This is horrible. They don't—they never even listened to them. They don't know that they have implicated, and they did not implicate, the security concerns and the confidentiality concerns. But in your—I mean, it's a violation of policy to record meetings and conversations at work. You're saying if they don't listen to them, that means that they're not serious about the policy? Right. They're not serious about determining the appropriate penalty. They didn't listen to see, well, was he just tape recording a baseball game off the radio, or was he tape recording some serious confidential information that he was going to sell to somebody? But again, isn't it up to you to show that they were recording baseball? That is, the question is, I don't deny that the original actions may say something about pretext, but that the burden on pretext has to be yours, and that's why I keep coming back to saying, what is it that you bring in to show that this was, in fact, different from how other people would be treated? Well, the only evidence in the record is that he taped training sessions for his own use, to be able to have the continuing education sessions, whatever they were, training sessions on tapes, where he could refer to them later. That's what he testified. There's no evidence that he taped anything other than training sessions and this conversation with Mr. Anderson and other instances where he was attempting to capture people mistreating and abusing them. And finally, I would say that the tape conversation, the context in which it has to be seen, is that Mr. Anderson had told Mr. Cassie, at the time when Cassie was being hired, that you have to watch out if there's racists and racism in this office. And he didn't use those words because he didn't have to. He rubbed his skin and told Mr. Cassie, this has issues in that office. And that is the context in which all of Mr. Anderson's statements during that lengthy conversation should be viewed. He didn't need to repeat to Mr. Cassie and tell him, look, we're managing a bunch of racists in this office, and they're going to be hard on you when it's too bad for you, you'd better tough it out. But that, in substance, is what he was saying. Thank you. Thank you. All right. Well, thank you both. We will reserve decision.